UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

PAUL GOTT, III,                          )
                                         )
    *Petitioner*,                     )     Case No. 1:16-cv-30
                                         )
v.                                       )     Judge Curtis L. Collier
                                         )
UNITED STATES OF AMERICA,                )
                                         )
    *Respondent*.                     )

## M E M O R A N D U M

Before the Court is a motion by Petitioner to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Docs. 1, 209[1]). The United States of America ("the Government") has responded. (Doc. 215). The time for Petitioner to reply has lapsed. *See* E.D. Tenn. L.R. 7.1(a)(3). For the following reasons, the Court will **DENY** Petitioner's motion (Doc. 209.)

## I.    BACKGROUND

### A.    The Offense Conduct

Three individuals, Travis Shields, Joshua Dobson, and Tommy Dobson, started a business called Southern Group, LLC ("Southern"), which, in concert with various subsidiaries, was to develop real estate communities. One of Southern's projects included developing "The Preserve," a 3,000-acre piece of real estate in Rising Fawn, Georgia. Joshua Dobson was in charge of the presentation and sale of lots on The Preserve. Petitioner was a close friend of Joshua Dobson, and with his Bachelor's Degree in finance and prior experience working at a bank, Petitioner served as an independent contractor for Southern. Petitioner communicated with real estate purchasers and

---

[1] The Court refers to the document numbers of Petitioner's criminal case, Docket No. 1:12-cr-42, throughout the remainder of this memorandum.

prepared financial packages for banks and closing agents to enable purchasers to close on the sales of lots in The Preserve. Because of a downturn in the economy, however, Southern experienced a sharp decline in the sale of its properties, and was having difficulty servicing its loans at various financial institutions. Instead of abandoning the project, however, Petitioner and Dobson concocted a scheme to obtain money for Southern by generating purported sales of Southern's properties in order to receive payments from financial institutions.

As early as 2007, Petitioner and Dobson sold lots by promising purchasers that there was no required down payment on the property, and that Southern would make all the monthly payments to the banks for a three-year period out of an escrow account maintained by Southern. In addition, Southern stated it would retain the option to buy back the lot at the end of the three-year period, all at a profit to the purchaser. The banks that financed the loans to purchase the properties, however, were none the wiser to this plan—Southern did not disclose to those lenders that it was providing the down payments to the purchasers or that it was making initial mortgage payments. And for good reason: banks wanted to be sure that purchasers were solvent and could afford the Preserve properties without assistance from Southern. Once a falsely financed purchase was made, Southern would receive the proceeds from the mortgage loan, and could use the money to pay for making more down payments on Southern properties, for making initial mortgage payments on previously purchased properties, or for servicing Southern's loans.

Beginning in approximately 2009, the scheme began to involve "gift letters." The letters were an effort to disguise the fact that Southern was furnishing money for down payments on property purchases. Under the scheme, a third person would sign a "gift letter," which would state that a third person was related to the purchaser and was gifting funds to the purchaser to use as a down payment. Southern would provide the down payment funds to the third person, who, in turn,

would provide them to the purchaser for the down payment at closing. On two occasions, the author of the gift letter was not actually a relative of the purchaser.

Because of Petitioner's and Dobson's representations, a number of individuals who did not have the financial ability or interest in purchasing properties and paying loans became the de facto purchasers of Southern properties. Meanwhile, financial institutions were fraudulently induced to make sizable loans to borrowers who could not actually afford to make a down payment. The proceeds of those loans were paid to Southern. When lot sales still continued to decrease, however, Southern did not have an influx of funds. And when Southern stopped making any monthly mortgage payments, almost all of the mortgages for Southern properties defaulted. Financial institutions lost millions of dollars, and approximately 225 investors' credit histories were ruined because loans for Southern properties had been made in their names.

### B. Procedural History

On May 1, 2012, Dobson and Petitioner were charged with one count of conspiracy to commit wire fraud and money laundering, seven counts of wire fraud, and four counts of money laundering. Petitioner was initially represented by attorney Leslie Cory. Petitioner attended an initial proffer session with the Government while represented by Cory. Within nine days of Petitioner's indictment, Petitioner was provided with an attorney from the Criminal Justice Act Panel (the "CJA Panel"), John McDougal. (Doc. 4.)

As the case proceeded to trial, the issues involved whether Dobson and Petitioner made down payments for purchasers through disguised gifts, and whether they engaged in such acts with intent to defraud. Dobson and Petitioner planned to defend the Government's allegations, in part, by claiming that Keith Smartt, a mortgage broker for purchasers of Southern property, had told them that a down-payment gift giver need not be a family member.

1.     **Pre-Trial Disclosure**

In the course of providing discovery to the Government, McDougal gave the Government three documents, consisting of four pages, which contained statements by Petitioner which were subject to the attorney-client privilege or were work product.

Two pages consisted of an email dated September 21, 2012 from Petitioner to his counsel. The email, in full and with errors in original, said the following:

> Here is the way that all of the 3 gift transactions went down. The economy had just tanked and the first programs that the banks and lenders cut were the raw land programs.

> Southern Group had some cabins for sell but they ran into the same problem with home loans as the cabin loans. They had borrowed with good credit, low debt but now the 20% downpayment.

> I randomly called several mortgage companies and ask if anyone had a program were the seller could contribute to the downpayment. All of them said no (The government has a statement from Chris Shoemake that will confirm this. Chris thought he had a gift program but it turned out he did not.) I randomly called Financial Solutions and Keith Smartt picked up the phone. I asked him if he had a program where the seller could contribute in the downpayment. He told me he had a couple of lenders that did gift loans. He said that as long as the funds were sourced and seasoned for 30 days, the lenders did not care where the gifter got their funds from. I had never heard of a gift loan and had never heard of this procedure. I had Josh call him to make sure that I was understanding what Mr. Smartt the way that I was interpreting it. He told Josh the same thing over the phone. Josh and I got together and called Mr. Smartt on a conference call and he again told us it did not matter where the gifter got the funds from as long as it was from a family member. He also said that each lender and underwriter was different.

> By this he was saying no one really paid attention to where the gifter got the funds. Josh and I then made an arrangement to see Mr. Smartt in person and went to Financial Solutions on Brainerd Road where he told us in person the same thing he had told us several times before. He processed 2 files to start and sent me the gift letter and instructions (You have emails of this). On Mr. Giles, you should have emails were I was going to send his son the money. Mr. Jiles and Louise Joseph were represented by Shirley Connor. Ms. Connor talked Mr. Dobson into giving

4

her $500 per gift transfer (since these were her clients) plus her standard commission. On Tahira Malik, the money went to her niece and then the niece sent it to Tahira (just as Mr. Smartt had instructed us).

Basicallly this problem started because Southern Group did not pay the payments for the two years as promised. Mr. Ruffin came to my house and told me this was wrong. I immediately cancelled two loans that I still had at Financial Solutions. I then hired Mrs. Cory to represent me in meeting with the government. I sent Mr. Smartt and email and asked him what he had repeatedly told me. I asked him, As long as the money is sourced and seasoned, it did not matter where the money to the gifter came from right? He then responded yes. The government said that my timing of the email was wrong but when I emailed Mr. Smartt I was not charged with anything. I then asked Mr. Smartt if he had any problems in talking with Mrs. Cory. She said not and she called him. The conversation was only between he and Mrs. Cory. He told Mrs. Cory he was under 'the don't ask don't tell' when it came to gifter's funds. That is why I think Mrs. Cory is so valuable. He told her this on his on free accord. I also think the email from him to Josh and myself is key because he acknowledges the problems on the previous two loans because he knew the funds did not come from the gifter.

Mr. Smartt was a broker employed by Financial Solutions. He was the only person that was allowed to talk to the banks and the underwriters. All I could do was gather information that he needed and fax or email it to him. On one of the deals, the seller is the Chattocchee corporation. I did not even get paid for the deal. I made a total of $2600 on the other two deals. On the Chattocchee deal, Southern Group had a hard money loan and put up a cabin for the collateral. If you look at the settlement statement, Southern Property management got a check. This was to pay commissions and two years worth of payments.

All of the gift transactions orginated with Financial Solutions which is a mortgage broker. None of these originated with Cornerstone Bank. I think it would be important to look at the 3 different plea deals that was offered originally. They first tried to say that Tahira's loan originated with BB&T and there were charging me with Bank Fraud. All of the loans originated with Financial Solutions. Once they realized this, they backed off and went after me on the conspiracy deal. I have nothing to do with Southern Group and that was proved as well. They wanted to do the wire fraud but did not know if it was in their jurisdiction. The charges have changed several times. I am working on what happened on each individual deal. I will get this to you as soon as possible.

The third page consisted of a list of eight basic questions Petitioner prepared, thinking his counsel should ask them to Smartt. The final page consisted of a list of corresponding answers Petitioner expected Smartt to have to the questions, all of them aligning with the email to his attorney. For example, to the question, "Does the mortgage company care where the gifter gets their funds?," Petitioner prepared the answer, "the mortgage company did not care where the gifter's funds came from (even the seller) as long as they were sourced and seasoned for 30 days but it is the underwriters call to clear conditions." And to the question, "Did you have a discussion with Leslie Cory about gift funds?," Petitioner prepared the answer, "He did have a discussion with Mrs. Cory and he told her he was under the 'don't ask and don't tell' on the gifter's funds."

Counsel for the Government contacted Petitioner's counsel upon receipt of the documents. Petitioner's counsel confirmed that the disclosure was inadvertent. The Government filed a motion for judicial inquiry, seeking the Court's advice on how to proceed. The Court held a hearing on the matter. (*See* Doc. 116.) Petitioner's counsel explained that the disclosure was inadvertent, but that most of the information in the email, including Smartt's involvement, had been previously disclosed to the Government through other means, and suggested that precluding the Government from using the email at trial would be an appropriate remedy. (*Id.* at 10.) Petitioner's counsel confirmed that the email did not disclose a defense theory or identify any witness the Defense was not already intending to call at trial. (*Id.* at 11, 13.) The Court considered whether the email could be used indirectly, such as through disclosing witnesses that the Government could later interview. (*Id.* at 11.) The Government stated, however, that it had previously interviewed Smartt. (*Id.* at 16.) Nonetheless, the Government's counsel also noted that cross-examination of Petitioner may be inhibited, were he to testify at trial, because certain questions they intended to ask Petitioner might be construed as derivative of Petitioner's email. (*Id.*) In that sense, the Government stated

that it would "be hard to unring the bell." (*Id.*)  The Government also said that it was not previously in possession of all the information contained in the email.  (*Id.* at 19.)

The Court afforded Petitioner a chance to speak.  (*Id.* at 26.)  Petitioner argued the Government should be prohibited from using the email, and that anyone on the prosecution team who read the email should be removed from proceeding against him.  (*Id.* at 32.)  The Court questioned Petitioner about how the email may harm his case if the Court were to prohibit its use at trial.  Petitioner stated that even if the email could not be used, the prosecutors would still have it at the back of their minds.  (*Id.* at 33-34.)  The Court then asked Petitioner to imagine taking the stand during his own case.  Petitioner said he would be harmed if the Government were to use the email to point out that his testimony on the stand was inconsistent with the email, or with what Petitioner may have said previously.  (*Id.* at 42-43.)  In that scenario, Petitioner understood that the jury would be less likely to believe his testimony.  At the same time, however, Petitioner also understood that the Government may already possess information consistent with what was in the email such that it would not be the email itself which was harming him, but the independent information known by the Government which was actually harming him.  (*Id.* at 43.)

The Court observed that removal of the prosecution team would be a radical remedy under those circumstances: the disclosure was unintentional, the Government played no active part in it, the Government took active remedial steps, and the Government would face tremendous hardship considering the time attorneys and staff had spent preparing the case.  (*Id.* at 59-60.)  The Court ultimately made the following ruling regarding the email:

> The Court, therefore, having found that the attorney-client privilege exists, that the disclosure was a mistake and inadvertent, and that the privilege still exists, the Court will prohibit the government from using the e-mail communication and the one-page questions and the one-page proposed answers in its case in chief or in its cross-examination of the Defendant. The Court will leave open the possibility of using the information for impeachment; that is, in the unlikely event that Mr. Gott

takes the stand and he says something the government believes to be perjurious, the Court then will take a look at whether the government can use the e-mail communication then to point out to the jury that the defendant has not been truthful while on the stand. And as the Court said, the Court really does not expect that to happen in this case.

(Doc. 116 at 61.)

The Court also noted during the hearing that the pretrial disclosure could provide a basis of a "possible 2255 later on down the road that would be based on ineffective assistance of counsel." (*Id.* at 23-24.) The Court continued,

At this point in these proceedings the Court believes it is premature and somewhat speculative to engage in a 2255 analysis. The Defendant has not been convicted of any crime at all, and there has been no record at all established indicating that there has been ineffective assistance of counsel. And ineffective assistance of counsel not only requires that there be substandard performance but also that the defendant be harmed by substandard performance. And at this point the Court cannot speculate as to whether the defendant will or will not be harmed.

(*Id.* at 24.) The Court confirmed with Petitioner that he understood that, if he was convicted of a crime, he would be able to file a § 2255 motion arguing that his conviction was unlawful. Petitioner confirmed several times that he understood. (*Id.* at 30.)

## 2.    Trial Proceedings

The case proceeded to a nine-day trial in April 2013. The Government offered the testimony of a number of purchasers of Southern properties, representatives of financial institutions who extended loans, law enforcement officers, and the authors of the gift letters.

For his defense, Petitioner called Smartt to testify. Smartt said he told Dobson and Petitioner that the gift-letter program allowed a borrower's family member to gift funds to the borrower for a down payment. Smartt testified, "I basically told them that, yeah, 'What we need to do is make sure that it's coming from a family member.'" (Doc. 125 at 10.) Petitioner's attorney then introduced an email from Petitioner to Smartt which stated,

> I know I have bugged you to death, but this is the last time I will ask. Please confirm for me as long as the gifter's funds are sourced and seasoned, the lender does not care where the gifter's funds come from. I won't ask you about this again. As long as they are seasoned and—'or' sourced and seasoned, the lender does not require any additional info from the gifter. Thanks, man.

(*Id.* at 10-11.) To which Smartt replied by email, "Yep, the lender will ask for a 30-day bank statement, and the money has to be in there, not just put in." (*Id.* at 11).

Smartt clarified several times on the stand, however, that he orally told Petitioner that the funds would have to come from a family member. (*Id.* at 33.) And on cross-examination of Smartt, the following exchange occurred:

> Q: All right. Now, you said that you talked to Mr. Dobson and you talked to Mr. Gott on the phone. Is that correct?
> A: Yes.
> Q: And you told them—when they asked you, "Hey, do you have any gift programs where the money can come from people other than family members?" what did you tell them?
> A: No.
> Q: What did you tell them? Who did it have to come from?
> A: It would have to come from a family member.

(*Id.* at 53.) Smartt also observed that a representation in a gift letter that Southern used for one of the transactions made it "very" obvious that a party with an interest in the transaction, including the seller, could not provide gift funds. (*Id.* at 56.)

Petitioner testified, claiming that no fraud had occurred and that funds were provided as purchase-options or lease-back arrangements. (*Id.* at 64-73.) Petitioner claimed he was unaware the mortgage program required funds to not originate from the seller and that the gift provider had to be a relative of the purchaser. (*Id.* at 85-86.) Petitioner contended that Keith Smartt told him and Dobson that the only requirement of the program was that the funds be in the gift provider's account for a period of time before the funds were wired to the purchaser. Though Petitioner made

these statements, the Government did not impeach Petitioner via the email sent to his attorney conceding that he knew Smartt later said the funds had to come from a family member. (*Id.* at 127-138; Doc. 128 at 2-91.)

The jury convicted Petitioner and Dobson of seven of twelve counts of the indictment. Petitioner and Dobson were convicted of the conspiracy count, four gift-letter-transaction wire fraud counts, and two money laundering counts which corresponded to the gift-letter transactions. (Doc. 85.) The jury acquitted Petitioner and Dobson of three counts of wire fraud in connection with transactions which did not involve gift letters, and two money laundering charges which corresponded to those transactions. (*Id.*) The Court subsequently dismissed a count of wire fraud for inadequate proof of venue. (Doc. 114.)

### 3. Sentencing Proceedings

Petitioner's presentence report ("PSR") stated his total offense level was 30 and his criminal history category was I, resulting in an advisory guidelines range of 97 to 121 months' imprisonment. (Doc. 146.) The Court held a sentencing hearing over the course of six days in order to resolve Petitioner's objections, most of which were directed at loss amounts. (Docs. 199-204.) In the end, the Court accepted Petitioner's assessor's testimony that a property at issue was worth approximately $3,200 per acre and concluded that the loss for purposes of the United States Sentencing Guidelines was $11,800,000. Petitioner argued the Court should consider only those losses presented to the jury and not those of acquitted or uncharged conduct. The Court overruled the objection, concluding that the Sentencing Guidelines required it to determine the amount of loss resulting from the conspiracy alleged in Count 1 of the indictment. The Court granted Petitioner's motion for a departure, and his resulting guideline range was 63 to 78 months. (Doc. 204 at 82.) The Court sentenced Petitioner to 75 months' imprisonment and five years of

supervised release, and ordered Petitioner and Dobson to pay $3,091,650.56 in restitution. (Doc. 191.)

### 4. Appellate Proceedings

A three-judge appellate panel of the United States Court of Appeals for the Sixth Circuit affirmed Petitioner's conviction and sentence. (Doc. 207.) As to Petitioner's arguments, the appeals court determined that: (1) Petitioner's pretrial disclosure of Petitioner's email did not violate his rights to a fair trial under the Fifth Amendment or his right to counsel under the Sixth Amendment; (2) the Court did not err in declining to remove prosecutors and investigators from the case in order to remedy any prejudice from the inadvertent disclosure; (3) the Court did not err in declining to appoint new counsel for Petitioner or through questioning Petitioner at the hearing on the motion for judicial inquiry; (4) Petitioner's sentence was procedurally correct because it was proper for the Court to consider acquitted and uncharged mortgage transactions that were similar to the conduct for which Petitioner was convicted; and (5) the Court did not err by failing to apply credits against loss identified or in valuing the property at issue at $3,200 per acre. (*See id.*) The appeals court did not read Petitioner's appellate brief as asserting an ineffective-assistance-of-counsel claim, and accordingly, did not address the claim on direct appeal. (*Id.* at 14 n.6.)

## II. <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. § 2255, a federal prisoner may make a motion to vacate, set aside, or correct his judgment of conviction and sentence. 28 U.S.C. § 2255(a). The prisoner must claim a right to be released because the sentence was imposed in violation of the Constitution or laws of the United States; the court lacked jurisdiction to impose the sentence; the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *Id.* As a threshold

standard, to obtain post-conviction relief under § 2255, the motion must allege: (1) an error of constitutional magnitude; (2) a sentence imposed outside the federal statutory limits; or (3) an error of fact or law so fundamental as to render the entire criminal proceeding invalid. *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003); *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). A petitioner bears the burden of demonstrating an error of constitutional magnitude that had a substantial and injurious effect or influence on the criminal proceedings. *Reed v. Farley*, 512 U.S. 339, 353-54 (1994); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152, 166 (1982). This is in line with the historic meaning of habeas corpus, which is "to afford relief to those whom society has 'grievously wronged.'" *Brecht*, 507 U.S. at 637.

Rule 4(b) of the Rules Governing Section 2255 Proceedings in the United States District Courts requires a district court to summarily dismiss a § 2255 motion if "it plainly appears from the face of the motion, any attached exhibits, and the record of the prior proceedings that the moving party is not entitled to relief[.]" *See Pettigrew v. United States*, 480 F.2d 681, 684 (6th Cir. 1973) ("A motion to vacate sentence under § 2255 can be denied for the reason that it states 'only bald legal conclusions with no supporting factual allegations.'") (quoting *Sanders v. United States*, 373 U.S. 1, 19 (1963)). As to claims raised which have been already addressed on direct appeal, a "§ 2255 motion may not be used to relitigate" those issues, "absent highly exceptional circumstances." *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). An example of such "highly exceptional circumstances" includes an intervening change in the law since the time the appeal was decided. *Giraldo v. United States*, 54 F.3d 776, at *2 (6th Cir. 1995) (table).

If the motion is not summarily dismissed, Rule 8(a) requires the district court to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. A petitioner's burden of establishing that he is entitled to an evidentiary hearing is relatively light. *See Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018). If a petitioner presents a legitimate factual dispute, then "the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (quoting *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007)); *Martin*, 889 F.3d at 832 (finding petitioner entitled to a hearing since he submitted affidavits from himself and his wife, and a copy of a related civil docket sheet with notes). Where the defendant presents an affidavit containing a factual narrative that is neither inherently incredible nor contradicted by the record and the government offers nothing more than contrary representations in response, the petitioner is entitled to an evidentiary hearing. *Martin*, 889 F.3d at 832 (quoting *Huff*, 734 F.3d at 607).

An evidentiary hearing is not required, however, if "the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Martin*, 889 F.3d at 832 (quoting *MacLloyd v. United States*, 684 F. App'x 555, 559 (6th Cir. 2017) (internal quotation marks omitted)). Nor does a petitioner's assertion of innocence, without more, entitle him to a hearing. *Martin*, 889 F.3d at 832.

## III.   ANALYSIS

The Court conducted an initial review of Petitioner's § 2255 motion and determined from its face that it should not be summarily dismissed. (Doc. 210.) Upon further review of the submissions of the parties, the record, and applicable law, the Court finds that a hearing is not necessary to resolve the motion.

Petitioner wrote his § 2255 motion in order to address approximately thirteen "issues," some of which address multiple errors Petitioner alleges occurred during his proceedings before this Court, others of which are somewhat duplicative of one another. In all of the issues raised, Petitioner claims that his trial counsel, John McDougal, was constitutionally ineffective in his representation. For purposes of analysis, the Court has grouped Petitioner's issues into three categories: (1) the inadvertent disclosure and use of the evidence at trial (issues 1-4, 11, 13); (2) representation during trial proceedings (issues 5-6, 9); and (3) representation during sentencing proceedings (issues 7-8, 10, 12).

## A.     Ineffective Assistance of Counsel

Ineffective assistance of counsel is a recognized constitutional violation that, when adequately shown, warrants relief under § 2255. *Huff v. United States*, 734 F.3d 600, 606 (6th Cir. 2013). The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs claims of ineffective assistance of counsel raised pursuant to 28 U.S.C. § 2255. *Id.* To demonstrate a violation of the Sixth Amendment right to effective assistance of counsel, "a defendant must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687).

The first prong requires a petitioner to show his attorney's performance was deficient by demonstrating that counsel's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Stated another way, the petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Huff*, 734 F.3d

at 606 (alterations in original) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  The Court has also recognized that, "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another."  *Strickland*, 466 U.S. at 693.

A reviewing court must be "highly deferential" to counsel's performance.  *Strickland*, 466 U.S. at 689.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* Because of the difficulties inherent in making the evaluation, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Even if a petitioner is successful in overcoming that presumption, he must still satisfy the second prong of the Strickland test, that is, prejudice.  A petitioner must show not only that his counsel's representation was objectively unreasonable, but also that he was prejudiced by counsel's deficiency because there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *McPhearson v. United States*, 675 F.3d 553, 563 (6th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.

Although the *Strickland* Court emphasized that both prongs must be established for the petitioner to meet his burden, it also held that there is no reason for a court deciding an ineffective

assistance claim to approach the inquiry in the same order or even to address both components of the inquiry. *Strickland*, 466 U.S. at 697. The Court stated, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

**B.     The Inadvertent Disclosure and Use at Trial (Issues 1-4, 11, 13)**

The majority of Petitioner's § 2255 motion concerns his trial counsel's inadvertent disclosure of the email and lists of proposed questions and answers to ask Smartt which he had sent to his counsel. (Doc. 209 at 2-6 (issues 1-4).) He argues that because the information was given to the Government, it was impossible for him to win his case. He also states that the email was used against him in court. While an inadvertent disclosure can hardly be called a "strategy," reasonable or not, the Court is unconvinced that Petitioner has demonstrated the requisite prejudice under the second prong of the *Strickland* analysis. *See Plunkett v. United States*, No. 4:04-CR-70083, 2011 WL 2199174, at *6 (W.D. Va. June 6, 2011) (finding similarly).

**1.     Direct Use of the Disclosed Materials**

Petitioner discusses the inadvertent disclosure and the judicial inquiry hearing at length in his first four issues. Petitioner does not, however, identify any point in his trial proceedings where the disclosed materials were directly referenced by either counsel or witnesses, or used in any other direct fashion. And as summarized in the background section above, the Court determined that the Government could not make direct use the email or the prepared questions regarding Smartt in its case-in-chief. In so ruling, the Court sought to nullify any prejudicial effect the email or prepared questions could have before trial had commenced. While the Court left open the possibility of using the information for impeachment purposes, and though Petitioner did testify, the Government did not seek to use either the email or the prepared questions and answers for

impeachment purposes. Thus, as to direct use of the disclosed information, the Court does not find Petitioner suffered prejudice or any reasonable probability that, but for McDougal's error, the result of the proceeding would have been different. *McPhearson*, 675 F.3d at 563.

In addition, the Court of Appeals has already rejected the idea Petitioner was prejudiced by the disclosure through use of the email at trial. (Doc. 207). Though the appeals court was exploring a potential Sixth Amendment due process violation, the panel conducted a full analysis of potential prejudice, stating,

> [T]he government did not use Gott's email at trial. Although Defendants argue that the disclosure of the email was fatal to their defense, they fail to explain why this is so. In fact, Gott testified consistent with the defense he sought to assert—that he did not believe what he was doing was wrong.

(Doc. 207 at 12-13). Because Petitioner has not identified an intervening change in law or new grounds for prejudice from direct use of the email since the Court of Appeals so decided, his § 2255 motion may not be used to relitigate the issue of prejudice stemming from direct use of the email. *See DuPont*, 76 F.3d at 110.

## 2. Derivative Use of the Disclosed Materials

Petitioner makes several further arguments regarding derivative use of the materials. First, he argues the email led the Government to a witness who testified against him, Chris Shoemake. He points out that the Government's counsel said during the judicial inquiry hearing, "Mr. McDougal states that we were in possession of this information. That's true to some extent Judge. We were not in possession of all the information contained—especially in the email with respect to the things that Mr. Gott stated to Mr. McDougal." (Doc. 116 at 31.) The Government's counsel also stated, "[t]he derivative use, Judge, I didn't—candidly, we did not know about the three other bankers that Mr. Gott claims to have talked to. But, like I said, I think that at some point that was going to come out on cross-examination, regardless of whether we had this." (Doc. 116 at 19.)

Petitioner states that Shoemake was one of the prosecution's first witnesses in their case-in-chief. Petitioner also argues that his attorney sought to cover or mitigate what he did by saying the prosecution team knew the information in the email before it was sent to them.

The Court first notes that there was no harm from derivative use of the email regarding the email's mention of Smartt. As the Court of Appeals for the Sixth Circuit observed, "the Government was already aware of Smartt, had interviewed him, and knew that Smartt had discussions with Defendants in which he told them the gift funds had to come with a family member." (Doc. 207 at 13.)

Second, while Petitioner argues there was harm from derivative use of the email because the Government called Chris Shoemake at trial, the email itself noted that the Government also already knew about Shoemake before the disclosure. In relevant part, the email stated, "I randomly called several mortgage companies and ask [sic] if anyone had a program were [sic] the seller could contribute to the downpayment [sic]. All of them said no (The government has a statement from Chris Shoemake that will confirm this. Chris thought he had a gift program but it turned out he did not.)[.]" Because the Government already had information from Shoemake, Petitioner could not have been harmfully prejudiced by the mention of his name in the disclosure.[2]

As to the "other bankers"[3] mentioned in the email, Petitioner argues, "[a]t trial, I was asked about the other bankers who the government did not know about until they got the email. That

---

[2] To the extent Petitioner misunderstood the extent of the Government's knowledge at that time, the possibility the disclosure did lead to other witnesses is discussed below.

[3] The Government stated at the hearing that it was unaware of "three" bankers mentioned in the email. (Doc. 116 at 19 ("we did not know about the three other bankers that Mr. Gott claims to have talked to.").) Upon review of the email, only two bankers are mentioned by name: Keith Smartt and Chris Shoemake. Petitioner's argument appears directed at the portion of the email where Petitioner stated "I randomly called several mortgage companies and ask [sic] if anyone had a program were [sic] the seller could contribute to the downpayment [sic]. All of them said no . . . ".

allowed the government to say that I had knowledge of the illegality of the 3 gift deals." In spite of this argument, however, Petitioner nonetheless volunteered information himself about his contact with other lenders. This strategy was consistent with his defense theory that Smartt was the only lender who told him it did not matter where any gift loans came from. On direct examination, for example, Petitioner testified,

> Q: Okay. Now, was he the only one that you called about [the gift loans] like that?
> A: No. I had talked to different people about gift loans.
> Q: And about how many? Because we heard from one. Was—The other gentleman that testified, do you recall who that was?
> A: Chris Shoemake.
> Q: Okay. Besides Chris Shoemake, was there anybody else you talked to about that?
> A: There were a couple others.
> Q: Okay. And what were you looking for?
> A: Southern had some cabins come available that were free and clear, had clients that had good credit but did not have the down payment. I was looking for somebody to finance the second home for Southern.
> Q: And so out of everybody that you talked to, who said they had a plan to go ahead and do that?
> A: Keith Smartt.

(Doc. 125 at 85-86.) Petitioner also testified to the following on redirect examination:

> Q: And you followed the gift program exactly as Mr. Smartt—
> A: I did, per the gift instructions that were given to me.
> [ . . . ]
> Q: Who were the funds supposed to come from?
> A: Per my recollection of the gift fund program, it did not matter where the funds came from as long as they were sourced and seasoned for 30 days.
> Q: Now, was that Mr. Smartt's program, or the other gentleman's program?
> A: Mr. Smartt's program.
> Q: What was the other gentleman's program? What did his call for?
> A: He had to have 15 percent, and it had to come from a family member.
> Q: Okay. And did the—did he say that—did they care where the funds had—could come from?
> A: Which gentleman?
> Q: The first one.

A:  Yes, he did. It had to be from a family member.

(Doc. 128 at 112-13.)  Because Petitioner's defense hinged upon Smartt's program, the Government's presentation of any evidence about the gift loan programs of other lenders was far less relevant to his criminal intent.  The Court of Appeals has already observed that Petitioner "testified consistent with the defense he sought to assert—that he did not believe what he was doing was wrong."  (Doc. 207 at 13.)  In addition, the Sixth Circuit noted that Petitioner "opened the door" for the Government to ask about his contact with other lenders on cross-examination because Petitioner "testified on direct that he had contacted other lenders," as is included in the excerpts above.  (Doc. 207 at 13 n.5.)[4]  Accordingly, the Court finds there is no reasonable probability that, but for the inadvertent disclosure of the email and its mention that Defendant knew other lenders would not let a seller contribute to a down payment, the result of his trial proceeding would have been different.  *Strickland*, 466 U.S. at 694.

Petitioner also claims that the disclosed questions and answers he prepared for his attorney regarding Smartt were derivatively used by the Government in order to prepare Smartt for trial.  (Doc. 209 at 6 (issue 4).)  While it is not entirely transparent how Petitioner believes the questions and answers were used, Petitioner seems to insinuate that the Government prepared Smartt to lie on the stand so that he would be a more credible witness.  For instance, one of the questions

---

[4] Reading between the lines of Petitioner's argument, Petitioner might be suggesting he had no option but to embrace this fact during his direct examination because Shoemake had already testified that Petitioner had contacted him in the Government's case-in-chief.  Hypothetically, Petitioner may have been able to claim an increased level of ignorance regarding the criminality of Smartt's gift loan program had no evidence come forth suggesting Petitioner had talked to other lenders with practices that prohibited the behavior he ultimately engaged in.  But even then, the Court does not find a reasonable probability that the result of his trial would have been different, because all of the gift letters at issue involved Smartt's gift loan program in particular.  The jury's focus, and the crux of Petitioner's defense, centered around Smartt's gift loan program, not those of other lenders.

Petitioner prepared was "Did you have a discussion with Leslie Cory about gift funds?" Petitioner's provided answer states, "He did have a discussion with Mrs. Cory and he told her he was under the 'don't ask and don't tell' on the gifter's funds." Petitioner's motion now before the Court also alleges that Smartt talked with Leslie Cory before trial, Smartt then telling Cory that it did not matter where the gift funds came from. Petitioner states that when Cory had the Government reach out to Smartt's office, Financial Solutions, Smartt was later fired. But Petitioner also states that Smartt, when asked about Cory on the stand, answered, "Who is Leslie Cory?" Again, Petitioner seems to insinuate that because the Government was tipped off about Smartt's contact with Cory and the defense strategy of intending to ask about it, the Government prepared Smartt to deny he knew Cory. He states, "[d]uring the trial, Mr. Townley, the defense lawyer for Joshua Dobson who was tried with me, got Mr. Smartt to say that he had been prepped by the government 6 times. Mr. Piper also said that Mr. Smartt had been prepped . . . the government got the questions and answers for Mr. Smartt from Mr. McDougal. Mr. Smartt's answers were very different from what he told Ms. Cory on his own accord." (Doc. 209 at 6.)

Petitioner, however, has only presented his unsupported allegation as to what he believes the Government may have done with the prepared question and answer regarding Cory. *Short v. United States*, 504 F.2d 63, 65 (6th Cir. 1974) ("petitioner's claims are stated in the form of conclusions without any allegations of facts in support thereof, as well as being unsupported by proof or reference to such proof; and his motion is, thus, legally insufficient to sustain a review"). The Court declines to engage in Petitioner's unsubstantiated speculation about how the Government may have prepared one of their witnesses, especially insofar as the speculation suggests the Government engaged in foul play. Even if Smartt was an untruthful witness, Petitioner himself notes that Smartt may have had his own motive to be untruthful apart from the

disclosure. He states, "I am positive his firing gave Smartt all the incentive he needed to change his story, by denying he talked to Ms. Cory, and testify [sic] against me." (Doc. 209 at 6.)

Other than his discussion concerning the question regarding Cory, Petitioner does not specify how he believes the questions and answers for Smartt were used at trial against him. Many of the questions and answers covered background information that had no direct relevance to Defendant's potential guilt or innocence. For example, the first three questions were simply, "1. How did you meet Mr. Gott?"; "2. How did you meet Mr. Dobson?"; and, "3. What types of loan programs did you discuss?" And overall, even if any of the proposed questions and answers for Smartt were derivatively used by the Government, Petitioner has not sufficiently demonstrated any prejudice which may have resulted.

The Court is unconvinced that Petitioner has demonstrated he suffered prejudice from the direct or indirect use of the information disclosed by his attorney such that the result of his trial would have been different had it not occurred.

### 3.    Removal of McDougal as an Attorney

Petitioner makes several claims that McDougal was only looking out for his own interests by minimizing the prejudicial effect of the email during the judicial inquiry hearing. (Doc. 209 at 3 ("it was clear my attorney was desperately trying to cover up or mitigate what he did.").) Petitioner argues McDougal said at the judicial inquiry hearing that he would be unopposed to the Government's use of the email during its case-in-chief. (Doc. 209 at 5 (issue 3).) Petitioner also argues McDougal should have removed himself as his attorney after the inadvertent disclosure (Doc. 209 at 9 (issue 11)), and that McDougal was "kicked off" the CJA Panel as a result of his case (Doc. 232 at 1 (issue 13).) The Court finds these claims to be unsupported by the record,

unsupported by external evidence, or previously determined by the Court of Appeals for the Sixth Circuit.

First, Petitioner's claim that McDougal said he would be unopposed to the Government's use of the email during its case-in-chief is belied by the record. (Doc. 116 at 15.) During the judicial inquiry hearing, McDougal requested that the Government be prohibited from using the email in its case-in-chief and in cross-examination of Petitioner, were he to take the stand. (*See id.*) In addition, the Court (mindful that McDougal may have had a conflict in addressing the disclosure during the judicial inquiry hearing) afforded Petitioner an opportunity at the hearing to explain his own point of view and discuss the impact that he believed the disclosure had on his case. After hearing arguments from McDougal, counsel for the Government, and Petitioner, the Court was able to ascertain the potential impact of the disclosure as well as how the impact of the disclosure could be alleviated.

McDougal was not constitutionally ineffective for not withdrawing from his representation of Petitioner after the disclosure. The Court of Appeals has already observed it was "not persuaded that the district court erred in failing to appoint new counsel for [Petitioner.]" (Doc. 207 at 14.) Thus, Petitioner's § 2255 motion may not be used to relitigate the issue of appointing new counsel after the disclosure in this instance. No "highly exceptional" circumstances are otherwise present. *See DuPont*, 76 F.3d at 110.

Last in regard to the disclosure, Petitioner notes his belief that McDougal was "kicked off the federal appointed lawyer list" after his trial and that he "feel[s] that sending the confidential email and questions was a key factor" in such occurrence. (Doc. 211 at 10.) First, Petitioner has presented no evidence demonstrating that McDougal is no longer on the CJA Panel. The Government contests this factual assertion. Second, even if McDougal is no longer on the CJA

Panel, the Court has no evidence before it suggesting that Petitioner's case was somehow a factor in any decision to "kick him off." Without such evidence, there could be any number of reasons for McDougal ceasing to serve on the CJA Panel, many of which could be voluntary or personal. Thus, this unsupported assertion does not warrant a hearing. *See Napier v. United States*, No. 93–5412, 1993 WL 406795, at *2 (6th Cir. Oct. 8, 1993).

### C.      Representation During Trial Proceedings (Issues 5-6, 9)

Petitioner raises several issues regarding the representation he received by McDougal during trial. He claims McDougal was ineffective for failing to call Leslie Cory as a witness at trial (Doc. 209 at 7 (issue 5)); for failing to communicate a plea deal (Doc. 209 at 8 (issue 6)); for failing to afford him a chance to review discovery (Doc. 209 at 9 (issue 9)); and for refusing to prepare him as a witness (Doc. 209 at 9 (issue 9)). The Court finds that McDougal's refusal to call Cory as a witness was strategically reasonable, and that Petitioner's allegations regarding an uncommunicated plea deal, uncommunicated discovery, and witness preparation are insufficient to warrant an evidentiary hearing.

### 1.      Refusal to Call Leslie Cory at Trial

Petitioner claims McDougal was constitutionally ineffective for failing to call his former defense lawyer, Leslie Cory, as a witness at his trial. He argues that "[i]f Ms. Cory would have taken the stand, the jury would have known Keith Smartt was not telling the truth." (Doc. 209 at 6.) He states her testimony would "provide some clarity regarding Mr. Smartt's email response that it didn't matter where the gifter got their funds." (*Id.* at 7.) He states that Cory would have been his "star witness," and that the decision to not call her as a witness forced him to have to testify on his own behalf. (*Id.*)

Decisions as to what evidence to present and whether to call or question witnesses are presumed to be a matter of trial strategy, and the failure to call witnesses or present other evidence can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004). Strategy certainly comes into play when considering whether to call a defendant's former attorney. There may be no more fertile ground for attaining damaging testimony than from calling a lawyer to testify about her former client. And while there is little to no caselaw covering a scenario where a defendant calls a former attorney during the defendant's criminal trial,[5] doing so could risk waiving the attorney-client privilege protecting prior communications with that attorney. *See* 32 Am. Jur. Proof of Facts 3d 189 ("Voluntary disclosure can waive attorney-client privilege").

Here, Cory represented Petitioner during the Government investigation and initial proceedings of his criminal case. Cory played a role in attending a proffer session with the Government where Petitioner discussed his case. Because of her prior role, calling Cory as a witness could have potentially invited inquiry into Petitioner's initial communications with her during the Government's investigation, as well as during the proffer session. This, of course, could have been highly damaging to Petitioner. Because of this, the Court finds that the decision to not call Cory amounted to a trial strategy which did not fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quoting *Millender v. Adams*, 187 F. Supp. 2d 852, 877 (E.D. Mich. 2002)) ("A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant."). McDougal was not constitutionally ineffective for failing to call Petitioner's former defense counsel as a witness at Petitioner's criminal trial.

---

[5] This, itself, seems to suggest the decision not to do so was strategically reasonable.

While Petitioner also claims his attorney's decision to not call Cory took his choice of testifying away from him, Petitioner presents no evidence indicating that he means this in a literal sense. Throughout his case, Petitioner retained the right to testify on his own behalf, or not. While he may have felt more inclined to testify on his own behalf based on his own evaluation of his chance for success, the Court finds that the decision was still his to make.

Petitioner also argues that Cory "could have contradicted Mr. McDougal's claim that the government already knew what was in the confidential email because she was present at the proffer meeting." (Doc. 209 at 7.) This comment appears aimed at McDougal's comments during the judicial inquiry proceeding. As included in relevant quotations above, however, counsel for the Government was forthright about what they did and did not already know regarding the disclosure at the hearing. Hearing further evidence from Cory on this front would not have impacted the Court's decision to suppress use of the email in the Government's case-in-chief.

### 2. Communication of Plea Deal, Discovery, and Witness Preparation

Petitioner claims McDougal was constitutionally ineffective for failing to communicate a plea deal offered on the last day of his trial. (Doc. 209 at 8 (issue 5).) Petitioner alleges McDougal refused the offer without consulting with him. Petitioner also says he never heard about the plea until after trial. Otherwise, Petitioner offers no details about the alleged plea offer or his newfound awareness that the plea existed. Petitioner also claims he was never afforded a chance to review the Government's discovery until he saw it at trial. (Doc. 209 at 9 (issue 9).) He argues he should have been able to see the discovery so he could have contradicted or defended against the evidence, but offers no additional detail about pieces of discovery which he was surprised by during his trial, or which he believed to be particularly damaging to his case. Last, Petitioner states that McDougal refused to prepare him as a witness because he did not want his answers to sound rehearsed. (Doc.

209 at 9 (issue 9).)  As to all three of these contentions, Petitioner has not submitted an affidavit in support of his claims.

The Government responds to these claims by contesting their factual accuracy, or otherwise, their lack of detail, support, or basis in the record.  The Government states that no such plea offer was ever made to Petitioner, and that it believes discovery was fully disclosed to Petitioner by McDougal.

Thus presented with a basic factual dispute among the parties, the Court must first evaluate whether Petitioner's allegations are sufficient to warrant a hearing on the dispute in order to determine their accuracy.  To be entitled to a hearing on the basis of a factual dispute, "the prisoner must set forth detailed factual allegations which, if true, would entitle him to relief under § 2255."  *Napier v. United States*, No. 93–5412, 1993 WL 406795, at *2 (6th Cir. Oct. 8, 1993); *see also Machibroda v. United States*, 368 U.S. 487, 495 (1962) (holding petitioner was entitled to an evidentiary hearing because his "motion and affidavit contain[ed] charges which [we]re detailed and specific"); *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002) ("in order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions" (internal quotation marks and citation omitted)).

Petitioner's wholly conclusory allegation about a plea offer is unballasted by reference to the source of Petitioner's newfound awareness of the plea offer, when Petitioner became aware of the uncommunicated plea offer, or even the shortest description of what the terms of the alleged plea agreement were.  While the burden borne by a § 2255 petitioner to obtain an evidentiary hearing is not difficult to meet, *see Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003), the "sort of evidence usually employed in such cases begins with sworn affidavits attesting to the

petitioner's allegations." *Galbraith*, 313 F.3d at 1009. Lacking even that, here, the Court agrees with the Government that Petitioner has not met his burden to merit a hearing through his unsupported, conclusory allegation. *See United States v. Kuc*, 282 F. Supp. 3d 443, 445 (D. Mass. 2017) (denying habeas petitioner hearing on conclusory allegations regarding uncommunicated plea offer).

For the same reasons, the Court finds Petitioner's unsupported allegation regarding the disclosure of discovery to be insufficient to merit a hearing. *Vaughan v. United States*, No. 1:14-00077, 2016 WL 7235783, at *11 (M.D. Tenn. Dec. 13, 2016) ("As to the discovery claim, Movant does not provide any details or specify the nature of the discovery materials that his counsel allegedly failed to provide him."); *United States v. Stewart*, No. CRIM.A. 08-124-ART, 2011 WL 382206, at *2 (E.D. Ky. Jan. 4, 2011), *report and recommendation adopted*, No. CRIM. 08-124-ART, 2011 WL 381951 (E.D. Ky. Feb. 2, 2011) ("Stewart does not provide any evidence that his attorney actually failed to share discovery materials with him"). Petitioner's allegations lack any detail, such as discovery by which he was surprised at trial, or which he believed to be particularly damaging to his case. Moreover, Petitioner's allegation is also challenged by the record, in that he referenced reviewing a document "since the investigation" during his trial testimony (Doc. 128 at 2-3), and expressed familiarity with nearly every exhibit the Government introduced upon his cross-examination (*see, e.g.*, Doc. 128 at 111).

The Court finds Petitioner's claim that his attorney failed to prepare him to testify at trial to be similarly unsupported by any further detail or affidavit in support of the claim. Moreover, the Court also finds that this claim would not indicate unconstitutional ineffectiveness under a *Strickland* analysis.

Even if McDougal erred in not preparing Petitioner,[6] Petitioner was not prejudiced such that the result of his trial would have been different. Petitioner testified at length consistent with his defense theory that he complied with Smartt's gift loan program. At no point did Petitioner inadvertently diverge from his theory or lose credibility through mistakenly contradicting himself. Moreover, Petitioner did not become overwhelmed or flustered upon the Government's cross-examination of him such that his defense theory was forcefully damaged. But in light of the amount of Government evidence from purchasers, representatives from financial institutions, law enforcement, and the authors of gift letters the Court is not convinced the result of Petitioner's trial would have been different if he had been further prepared as a witness. *See Wilson v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999) (finding petitioner was not prejudiced by inconsistencies on his cross-examination to such an extent that the fairness of his trial was a concern, even if trial counsel erred in not further preparing the petitioner).

### D. Representation During Sentencing Proceedings (Issues 7-8, 10, 12)

Last, Petitioner raises several claims regarding the ineffective assistance of his trial counsel during sentencing. All of the issues are related to the concept of relevant conduct. Petitioner argues McDougal erred by allowing the Government to introduce emails from himself to Patty Martin in violation of the Court's Rule 29 order because that order stated that the Government had to prove that the emails came from the Eastern District of Tennessee and not Rising Fawn, Georgia (Doc. 209 at 8 (issue 7)); for not objecting to evidence about 102 loans which were introduced at sentencing since the majority of those loans were actually done by the Government's witnesses,

---

[6] Such is not necessarily the case. As to trial strategy, Petitioner himself states that McDougal did so because he did not want Petitioner's answers to sound rehearsed. This suggests that McDougal was making a strategic calculation regarding the presentation and credibility of Petitioner.

Bernard Mosconi and Jim Tobin (Doc. 209 at 8 (issue 8)); for not objecting to a box of documents introduced at sentencing which a "simple review would have shown they did not prove relevant conduct" (Doc. 209 at 9 (issue 12)); and because the idea of "relevant conduct" was never explained to him (Doc. 209 at 9 (issue 10)).

As to the emails which related to the Court's Rule 29 order, the United States Sentencing Guidelines "permit district courts to apply the 'relevant conduct' provisions to charged, but dismissed, conduct[.]" *United States v. Conway*, 513 F.3d 640, 643 (6th Cir. 2008). And statutorily, 18 U.S.C. § 3661 suggests courts have nearly limitless leeway in the materials they may consider when imposing an appropriate sentence. 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). Because the Court could properly consider the emails from Petitioner to Patty Martin at sentencing, McDougal did not err by failing to object to their admission. And while Petitioner also argues McDougal should have filed a motion to suppress so that his exposure would have been more limited, the evidence could have still been considered at sentencing if it had been suppressed during trial. *United States v. Jenkins*, 4 F.3d 1338, 1345 (6th Cir. 1993).

Next, the Court of Appeals has already rejected Petitioner's arguments regarding the 102 loans in the context of a challenge raised by his co-defendant. The appeals court stated that the Court did not err by considering transactions which purportedly differed from the gift-letter transactions for which the co-defendants were convicted. (Doc. 207 at 17.) The appeals court observed that,

> The conspiracy count charged Defendants with a scheme to defraud in which they
> deceived mortgage lenders by creating the appearance through false closing

> documents, including gift letters, that the purchasers were providing their own
> down payments when, in fact, Southern was providing them. All of the transactions
> the district court considered were part of the scheme for which Defendants were
> charged and convicted. In each transaction, Southern provided funds for the down
> payment to the purchaser and hid this fact from the lender.

(*Id.*) Petitioner does not overcome this finding through his conclusory allegations that the evidence of the other loans was not relevant to him or that the Government used a box of documents to prove relevant conduct which did not actually prove relevant conduct.

Petitioner also argues that the concept of relevant conduct was never fully explained to him by McDougal. He argues he would have accepted a plea agreement had he known about the concept of relevant conduct. Again, however, Petitioner's claim about the alleged uncommunicated plea offer suffers from a lack of detail and factual support, which precludes a finding that he was prejudiced by a failure to accept the plea.[7]

## IV.    CERTIFICATE OF APPEALABILITY

Having considered all of the issues raised by Petitioner, the Court must consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c)(1), a petitioner may appeal a final order in a § 2255 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). Where a claim has been

---

[7] The Court also notes that Petitioner's co-defendant made a similar argument regarding his lack of understanding of the United States Sentencing Guidelines and relevant conduct in his habeas petition. *Dobson v. United States*, No. 1:12-CR-42-CLC-SKL-1, 2018 WL 3973407, at *6 (E.D. Tenn. Aug. 20, 2018). As the Court previously observed, "counsel's failure to provide Petitioner with calculations of his sentencing guidelines range in this case prior to trial was reasonable, as no attorney could have accurately predicted the Court's loss calculation in this case due to the specific complications of the poorly-drafted indictment and the difficulty of calculating the losses specifically at issue in this case." *Id.*

dismissed on the merits, a petitioner must show that reasonable jurists would find the assessment of the constitutional claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right, as jurists of reason would not debate the Court's findings as to any of Petitioner's claims addressed on their merits.  Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA **SHALL NOT ISSUE**.

## V.    CONCLUSION

For all of the reasons described above, the Court will **DENY** Petitioner's motion (Doc. 209.)

**An Order Will Enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**